Next case is In Re Lister, case number 2009-1060. Mr. Mitchell, you are reserved five minutes of your time. That's correct. For rebuttal. You may proceed. Good morning. May it please the court. I would like to begin this morning by pointing out that the board's decision in this case fails to make any specific finding as to the date on which the Lister manuscript at issue supposedly became sufficiently publicly accessible to qualify as a printed publication under section 102B. Yeah, but we've got a large amount of time here to work with. So why shouldn't we, why isn't it appropriate for the board to have presumed and for us to presume that within a reasonable amount of time or a relatively short amount of time, this appears, this registration appears for the copyright and also goes to Westlaw and Dialogue? Why isn't that just, or at least, at least enough of a presumption so that you all have to come in and show that within a year or whatever that time frame was, that wasn't the normal course? That's a good question, Your Honor. I guess I would respond just by reminding the court that we're talking about dates in 1994, 1995 time frame. Obviously, this is in a time frame when computer networks don't look like they look today, well before the era of the World Wide Web and so forth. So it's not at all clear from this record when the keyword search capability was added, when it became a function, and it may very well have occurred prior to the critical date, it may not have, but it's the burden of the Patent Office to show when it occurred. It's not the burden of the applicant to come forward and disprove. So you don't even think this function existed at that point in time? I thought the question was how long it kind of took them to get it on the Westlaw dialogue, but not that the capacity, and that's how they were operating at the time. No, Your Honor. There's no evidence in the record as to when the keyword search capability came into existence, and that is a fundamental issue. The Patent Office, the examiner relied on the statement in the information disclosure statement that was provided for that inference, that the keyword search capability was there the whole time. We made it very, very clear in responses to rejections that we made no such admission. We pointed to the statement, and rather than respond on the merits, the examiner took the unfortunate position that our attitude was unfathomable, that the record was quite clear, but it isn't. I mean, you can go to it. It's a JA-123. There simply is no admission there as to when that functionality became available. At most, what this demonstrates is that as of January 9, 1998, when the phone call was made to the Copyright Office, at that point in time, the keyword search functionality existed. But, of course, that's totally irrelevant. What about the circular that you cite in the IDS disclosure? The circular doesn't go to whether or not the keyword search functionality was available on Westlaw or Dialog. That goes to the automated catalog maintained by the Copyright Office itself. And maybe that's the fundamental issue here. We need the Patent Office to clarify the date on which the circumstances which made it such that this document was sufficiently accessible to qualify as a publication. Without that threshold determination, once we've decided, was that date when the keyword search functionality was added? Okay, fine. Now, when was that date? Did it happen before the critical date or after the critical date? But I thought that even if, assuming we knew that there was a keyword search capability, your argument would still be that we don't know what the transfer time is between the copyright and getting it on board with respect to Westlaw and Dialog. That's another issue. Again, these are all issues, factual issues, that need to be established by the examiner, by the Patent Office. There's a branch of the Patent Office that is dedicated to resolving these exact kinds of issues. Let me ask you. If Mr. Lister's manuscript had been on the shelf of every public library in the country and was included in a catalog but only searchable by title or by author, would your view be that that is not publicly accessible because it's not searchable by keywords? No, I think my view under that hypothetical, Your Honor, would be that that would be a printed publication. So what's the difference between, I mean, it was searchable in the Copyright Office. If you came in and said anything, I want to see anything by Mr. Lister, it was available for anyone to inspect at the Copyright Office, right? Actually, no. The record, again, is clear on that point. So we've posited in our reply brief three possible dates or circumstances under which it might be the position of the USPTO that this document was a printed publication. The first is immediately upon receipt of the Copyright Office, and that's the one date that we know. That was in July 1994. We know the date of registration. Yes, exactly. So we know that date. Now, it doesn't seem plausible for it to be the position of the USPTO that as of that moment in time, this document was a printed publication. The Bayer case, I think, goes exactly to that issue. That's the case where we had a thesis that sat in a reserved part of the library. It was back. No, but what I'm trying to get to is do we need, if somehow there's enough evidence to show that that was very timely availability by the registration of copyright, is that sufficient for you to lose, or why do we need to also have it available in the keyword search and dialogue in Westlaw, if I'm understanding what went on here correctly? Yes, okay. So there are, again, three possible dates. Immediately upon receipt of the Copyright Office, probably not the position of the USPTO, but I'll let them address that. The second possible date is the date on which it was added to the automated catalog maintained by the Copyright Office. At the moment of this IDS, in 1998, that automated catalog did not have keyword search capability. That much is clear. It was first word only of the title. The first word of this title is advanced, has nothing to do, again, it does not appear to be the position of the USPTO that the automated catalog of the Copyright Office was sufficient. So the only thing left now at this point is… Why is that really a critical time period that you're talking about? Why should the keyword catalog indexing be a mandatory requirement for public availability? Isn't the real issue is when does it become publicly available? Yes, exactly. And when is that date? Yes. And the test for public accessibility, as this Court is well aware, is in the case of a document sitting in a library, like Hall and Bayer and Cronin, all these cases where you have a thesis or something sitting in a university library, that alone is not sufficient. You need that plus some subject matter index, some card catalog, something. That's what my question was getting to. If there's no keyword search capability, but this transcript is sitting in every library shelf in the country and it can be searched by name and by title, isn't that enough? Okay, so your question, I think, goes to two separate issues. The first is how does the interested researcher get there? My question is what would our case law say about that hypothetical? Is that sufficient if it's searchable not by keywords but it's everywhere and it's searchable by title and by author, which I think is corresponding, obviously, to what was available at the Copyright Office. Yes. I think it would depend on the particular libraries in question and how they maintain their records. So the Copyright Office, for example, is a giant repository where I think literally millions of authors send their works and it makes no attempt to segregate them based on subject matter. I think in the hypothetical you're positing that most libraries in the world, university libraries, you can walk in and say, I'd like to study astronomy, please, and they direct you over here and I'd like to look at computer technology and that's over there. There's some subject matter organizational scheme which is nonexistent at the Copyright Office. So I don't mean to evade the question. I'm assuming... No, so is your answer that searchable by title and author is not adequate to make it publicly accessible, that you need some sort of keyword or subject matter accessibility? My position is that what is ultimately required in these kinds of cases is something that would enable a researcher interested in the subject of the application, of the invention, to find the document in question. And your view here, that's golf, that's handicaps in golf, that's use of T's in golf handicaps, what is that? Well, again, it's the burden of the PTO to come forward and say what's the roadmap that would lead somebody to this particular reference and the only words they've been able to come up with at this point for this particular manuscript are the words golf and handicap. And we've outlined clearly in our briefs, those are not very descriptive at all of the claimed invention. Why are they not sufficient? Certainly this invention relates to the game of golf and it relates to a type of handicap. That's correct. So I guess the question becomes, if somebody, we're imagining the hypothetical researcher who's interested in golf handicaps, we first have to assume that that person would go to the Copyright Office, they'd be motivated to go to this giant repository which has novels on golf, books about poetry, I mean, millions of works. There's no distinction between the fiction and the non-fiction even. And there's this keyword search capability is supposedly the portal that gets them to this particular manuscript. When you're talking about keyword search capability, you're talking about being able to search all of the words in the document? No, just the title only, that's a critical point. The Copyright Office makes no attempt to scan all the voluminous... But Westlaw and Dialogue do. No, no, maybe that point was lost. The Westlaw database, the Dialogue database, all of them are keyword searching the title only. It's the title only. And our position is keyword searching of titles only is an inadequate proxy for a true subject matter index. So as to be clear, we're making the distinction between, shall we say, full text search capability and simply the search capability of the text of the title. That is correct. So your position is that full text search capability is not required, or full text search capability is required in order for this to be publicly accessible? If full text search capability was available, then this document may have constituted a printed publication. But there's absolutely no... But what about title search capability? Title search capability is what the Patent Office is trying to suggest is a proxy for a subject matter index here, and our position is it's an ineffective, inadequate proxy for a subject matter index. Of course, our cases have talked about accessibility being tied in some respects with respect to documents in libraries to some indexing. Yes. But there isn't a lot of clarity as to what exactly that means. What does indexing mean? Does it mean topical index? Does it mean simply words that might have some relationship to something? Does it have a connection with claimed subject matter? What are your views on what is required for purposes of indexing to reach the conclusion that there's public accessibility? I see I'm well into my rebuttal time at this point. We'll restore it once you answer the question. I agree. The case law on this point is unclear. And the seminal case that everyone cites is Hall, and when you go back and read the Hall case, it's not at all clear what the index was in that case. I would point to Cronin as a good example. Cronin is the case where we had the cards that were available, and the court does go into some detail in that case. What if the only thing on the index, what if it was just an author index? Exactly. And what if in this particular area of golf, your client was a recognized expert in the field, and everybody would know. If you want to get the latest and greatest about golf, look for things authored by Dr. Lister. Yes, a very interesting hypothetical. A couple of points. Cronin was exactly an author index. That's how the cards in Cronin were maintained. And just like here in Cronin, some of the theses on those cards had descriptive titles, and others, of course, had less descriptive titles. And ultimately this court held that was not sufficient. An author index with titles, that's exactly what we have here, was insufficient. And I would submit that Dr. Lister is not a celebrity in the golf world. If the PTO wants to take the position that by virtue of his name, his name recognition, that constituted an adequate portal in, I'm certainly happy to respond to that argument. Let me expand on Judge Lynn's hypothetical, which is we all agree, or at least do you agree, that the Copyright Office was searchable by author and by the first word in the title? Yes. Now here that was a little meaningless since the first word was like advanced. That's correct. But what if the title of Mr. Lister's manuscript was Handicapping for Golf or Golf Handicapping? So that if someone is interested in handicapping golf, they pick the word handicap or golf. Wouldn't that make it publicly accessible? Again, very interesting hypotheticals. And I think what this demonstrates is the insufficiency of the index to begin with. It shows that... Wait, the Copyright Office's index? The Copyright Office's index. Again, to address your hypothetical, we're talking about how do those titles get assigned? They get assigned by the arbitrary decision of the author who's sending in the work. Dr. Lister himself chose this title. He could have called it his manuscript, his memoirs, thoughts by Dr. Lister. He could have called it any number of things. It's a completely arbitrary decision. And so if this court wants to take the position that we're going to... the subject matter index or the indexing that's sufficient for this particular library constitutes the arbitrary submissions of the millions of authors who send in copyrighted works, that doesn't seem like... it doesn't seem like an adequate subject matter index into this particular library. That's the issue here. Can we take the assumption that the library would take the issue, the Copyright Office would allow the indexing to take place within a six-month period if, in fact, every indexing was done within six months? Can we assume that? Hall, I think, addresses this very point. The issue in Hall was there was no specific evidence as to when the particular thesis at issue there was processed through. And what the USPTO relied on there, which was ultimately held to be sufficient, was the declaration of the librarian who said, it normally takes about such amount of time to process these things through. I don't know how much it took for this particular one. Maybe it was off by whatever, some reasonable margin on either side. But that's exactly the kind of evidence we don't have here. I don't know how long it takes. Is that a fair way to do it, though? Well, I think that's a decent compromise. I think to compel the Patent Office to go out and show for every single document that comes before it, we have to show exactly when this specific reference became accessible, that's certainly a plausible reading, but that's inconsistent with the holding in Hall. And I think Hall represents a decent compromise. Mr. Medjugorje, thank you. And we'll restore three minutes of your rebuttal time. Thank you, Your Honor. Mr. Piccolo, we'll add some time, five minutes to his time, please. If you need it. Thank you, Your Honor. As to the 13-month window point, it's very important that Mr. Lister stated with his full disclosure to the PTO that Westlaw searching by keywords was available, and that's what he said to the PTO. And he also said that Westlaw directly – Yeah, but there's no exact time. I guess let me start with there's no dispute, is there, that the Copyright Office is only material in the Copyright Office to the extent it's searchable at all or when it's searchable, leaving that aside. It would just at most be by title and by first word in the title and by author, right? Correct, Your Honor. So it's not the Patent Office's position, is it, that registration, and even if it had been available within a reasonable short amount of time at the Copyright Office, that would be sufficient. We need to have availability through Westlaw and dialogue to satisfy accessibility in this case, right? In this case, correct. All right. We all agree with that. And so the only thing you have is his IDS, that it's available. Do you agree there's no other evidence in the record that would show whether it takes the Copyright Office, or at least it took the Copyright Office in 1995, for days or for years, or they had an error rate of 75% because their computer system was on the freak in 1995? Nothing else? No, Your Honor. There is from the IDS. No, in other words, there's nothing other than the IDS. I'm sorry. I want to add, Your Honor, that through the patent prosecution, the examiner clearly applied 102B, which has the date timeframe to get before a year, before the application filing date, and the examiner clearly applied Mr. Lister's directly obtained from the Copyright Office and Westlaw keyword searching representations to the PTO. The examiner applied the facts as given by Mr. Lister in his full disclosure to the PTO, and the examiner clearly made 102B printed publication rejections all the way throughout the prosecution after he applied the statements in the IDS. It sounds to me like your answer to Judge Pearl's question is there is no evidence other than the IDS with respect to the date when this index might have been available. Correct? That's correct, Your Honor. As to the evidence that the examiner applied to set forth his prima facie case with substantial evidence that Mr. Lister knew about from the time the 102B rejection based on Mr. Lister's statements about keyword searching and Westlaw directly obtaining the registration information from the Copyright Office, and the examiner continued with that rejection, and then Mr. Lister specifically chose only two arguments to the Board that indexing is required, which we know by N. Ray Klaus. But back to his IDS statement. It doesn't have a time frame. I mean, it says it's available to the public through an automated catalog. It doesn't say whether that is available one day or one year or ten years. I mean, it's tough for me why he thinks this IDS is so conclusive. Maybe this will help, Your Honor. In the middle of that page 123, Mr. Lister, after doing his due diligence to know all the pertinent facts about this disclosure to present those material facts to the PTO, he says in the first full paragraph that begins in the middle of the page in the second sentence, the information contained in these databases comes directly from the Library of Congress and therefore is available in essentially the exact same format as found in the automated catalog of the Library of Congress. It says comes directly from. Not just comes from. That would have been sufficient. So directly tells us that there's a time frame, and what is that time frame directly? Since you're placing weight on directly, does that mean we know, therefore, that it happened within a week because directly means a week? Well, it presents that there was a direct association from Westlaw to the Library of Congress, and the examiner used that information. And what's very important here... It doesn't answer the question when. No countering evidence submitted. When was it available? What's a day of availability? It's not there. Well, thank you, Your Honor. The examiner relied on the copyright registration date of July 18, 1994, and that was the date that Mr. Lister received copyright protection through the Copyright Office's registration. From that date onward, when Westlaw directly obtained the copyright registration information, that essentially started the 102B clock that you should get to the PTO within a year of getting that registration. Why should that date be critical if, in fact, it would not be available to the public at that point? Well, Your Honor, it was available to the public because it was a copyright registration... Was available when? At the Library of Congress. It was submitted... When was it available at Westlaw? When was it available? What has been presented is that it was directly around the time of the Copyright Office's housing... Well, isn't directly in this content? I mean, now you're saying directly means directly around the time, but doesn't directly kind of mean a positional thing? It's directly. I mean, although I would read directly, the normal reading of directly means they're not intervening ways and they're not steps and it isn't sent over to whatever, but it goes directly from one place to another. It could then just say it comes from the Copyright Office. You wouldn't need to emphasize it comes directly, and the time frame that he was submitting this information was, again, in the spirit of full disclosure, I'm telling you about prior art. So, therefore, if he's saying... But if I say I'm going directly home after this proceeding... You didn't say I'm going home. No, I mean that I'm not going to stop anywhere on the way. I might live in Australia. My home might be in Australia, and because of the flight schedule, it might take me two months to get there or at least two weeks. I don't understand why directly gives you a sense of any particular time. It sets forth a prima facie case for the examiner to rely on and then in a non-final office action tell the applicant, and he told Mr. Lister, and Mr. Lister did not come back with any countering evidence, nor did Mr. Lister raise this type of argument in his brief to the Board. In his brief to the Board, so we've argued waiver, because this is a new argument in the new brief. In his brief to the Board, all he argued was indexing is required, which we know by In re Klopfenstein, which the Board aptly applied, is not the case law, and he also argued that the Copyright Office restricts access, and we also know from In re Klopfenstein that viewing something can be enough to digest and absorb the invention, and Mr. Lister's manuscript expressly describes his invention as a handicap way of playing golf. So somebody would use those words, handicap plus golf, and get to not only the title of his invention, but it was the essence of what he had in his manuscript. When would that be available? That's the critical issue. When is it available to the public? The presumption is around the time of the Copyright Registration granting, and let me say why. Because Mr. Lister submitted the disclosure to the Library of Congress, to the Copyright Office, before getting his Copyright Registration. He submitted it around July 4, 1994. So they have it, and if they're going to grant a Copyright Registration on that work and give it a date, which Mr. Lister then received as a Copyright Protection, how could you come up with any other date that the Copyright Office would grant a registration but keep it in some secret room or something like that afterwards? No, it's at the Library of Congress, and here we have much better facts than In re Klopfenstein. So you were saying we use the date of registration. What if we were only a day off here? I mean, I realize now we have, in this case... It's a window like in Ray Hall that was less, like two and a half months, is a tougher case, if that's what your honor is getting at. If the window was small, it's not in this case. It's very large. He waited more than two years from getting his Copyright Protection, from getting that registration, and Congress has said, if you engage in public activity, that's okay. Just go to the PTO within a year. He waited a full another year and filed in August 1996. So we have a window that is much larger than in Ray Hall. In Ray Hall had a two-and-a-half-month window. We have a 12-and-a-half-month window here, and in Hall there was an index for the library in Germany to get to the enzyme thesis. Here we have, per Lister's disclosure, keyword searching of a much simpler invention, Golf and Handicap, expressed in the title, Golf and Handicap, expressed in his disclosure, Golf and Handicap. So he should have gotten to the PTO within a year of the Copyright Protection. The IDS says in the passage you read a moment ago from page 123 of the appendix that the information contained in these databases comes directly from the Library of Congress. Correct. And is essentially the exact same format as found in the automated catalog of the Library of Congress. That automated catalog contains the author's name and the first word of the title or the entire title. The whole title, Your Honor. And that's why Mr. Lister, throughout this prosecution, expressed that the title, in his view, is not enough. We take the opposite position because his disclosure says Golf and Handicap and so does his title. And he says that keyword searching, as the examiner and board discussed, would not be enough. So clearly everyone has been on the same page that the full title that comes from the Copyright Office automated catalog is directly obtained from Westlaw. And Westlaw, as Mr. Lister, when doing his due diligence and disclosing fully to the PTO, says, with that title, and he says right here, going down that same paragraph, Your Honor, however, searching by keywords, or he says, the only additional feature, and we say it's quite an additional feature, not just only, offered by computerized searching, such as in the Westlaw database, is the ability to search the titles of words using keywords. Wait, but that's not true for the Copyright Office. In the Copyright Office, you search only by the first word and you would agree since what is the first word here? Advanced. That would not be publicly accessible. Correct, Your Honor. If we had those different facts with just the Copyright Office, it may be more like N. Ray Cronin than N. Ray Hall in this case, where we have something better than an index. We have keyword searching capabilities. So unlike in the Freeburg Library in Hall, you have to be in the library and go to an index, it probably said, theses, enzymes, something like that, to get to that index, to get to the work. Here, you're in the Library of Congress, here in the U.S., you could use Westlaw in there, you could use Westlaw in an adjacent building, you could use Westlaw across the country, and identify whether you don't... What if you do a search on Westlaw and there are a million results that pop up if you search the words golf and handicap? Does that change the result here? No, Your Honor. One, because we don't know that the result would have been voluminous at all. That, again, could have been countering evidence that this applicant could have submitted to counter the examiner's prima facie case. Likely not. Handicap is a general and common term, and as Mr. Lister described, it could concern things like different tee boxes on a golf hole, like a numbering system when playing golf, and like his teeing up in the fairway or rough. So works written about handicap and golf, the test is could somebody find this invention? So you're saying that we should use our common sense to imply there's a manageable number and the prudence shifts to him to show that it's not? Absolutely, Your Honor. And as much as the examiner used his express statements when fully disclosing to the PTO  he did not say anything about, however, when using handicap and golf, and he gave an example when using just golf. He said there may be, and this was just an attorney argument throughout the rest of the record, that you may have more than 10,000 hits or you do have more than 10,000 hits. So your position is? Golf plus handicap and give it a lesser number or countering evidence, like Ingrate Hall and Nature's Remedies say that it's a chance for the applicant to rebut the examiner's prima facie case, especially here when the applicant himself provided the evidence with fully disclosing to the PTO. So you're saying that it's enough when the applicant says you can search the Westlaw database without specifying when that search capability was available. That's enough for the Patent Office to say, fine, we've made our prima facie case simply because the applicant says you can search Westlaw without specifying when. That's enough to make a prima facie case and then it's up to the applicant to come back and say, no, no, no, you couldn't do it back when. Precisely, Your Honor, precisely. And what the applicant then chose to argue were deviations from the prima facie case that, oh, the title was a lot different than the invention, which it was not, because he used his handicap in golf in his disclosure invention. So he chose a differing route and consciously chose to not submit rebuttal evidence, like maybe you said, Your Honor. And he then chose you wouldn't find it because the title is not enough or indexing is required, which we know the case law does not hold that way. And then his only second other argument to the Board was that the Copyright Office restricted access. So he's had a very full prosecution in this case, stemming from what he said to the examiner before the first go-around. The examiner applied 102B, and we all know that 102B has the one-year-before date deadline, and said, based on what you have said to me, keyword searching plus the Library of Congress make this work publicly available. Essentially, you should have gotten to the PTO within the year of when this work was at the Library of Congress. It's a non-final office action. Give me some evidence. And the applicant only chose argument at that point in time. Let me ask you a question regarding the possibility of having the examiner also test that hypothesis and ask for that information. Did the examiner search for that information? When the IDS discloses patent numbers, I know that most examiners will check those patent numbers to make sure that the patent references that are cited do in fact disclose what the inventor or the applicant at least submits. Did the examiner do that in this case? We don't know that from this record, Your Honor, and I don't see that Mr. Lister asked the examiner or challenged the examiner's findings in that respect or asked him or showed that he needed to go further. Had that happened early on in the prosecution, it may have been a much different case. There could have been, but we really don't think there was, a dispute about the registered copyright housed at the Library of Congress in July 1994, and there was a two-year window here that the examiner needed to fall in, the 12-and-a-half-month window, and the Library of Congress, like many federal agencies, gets its documents, and it's a lot easier to keep it publicly available once you issue a copyright registration. I just have trouble thinking what they would do to keep it away from the public. Well, just like the Patent Office, I think there's one document in here, Mr. Piccolo, that shows that the Patent Office took three years to handle a motion. There's a footnote indicating that the instant petition was only recently brought to the attention of the deciding official. Three years it was pending, and it was not acted upon. Was that in this case or a case study? In this case. Oh, Your Honor, there are special instances in this case of... Does that only happen in the Patent Office? Could it happen in the Copyright Office, too? Oh, I'm sorry, Your Honor. In situations such as not acting on something, there could be any one of a number of explanations. If there was a change in personnel or if a computer system somehow dislodged something for a period of time. Could it happen in the Copyright Office, too? Well, if there were intense prosecution as to a particular not-so-short case with prosecution at the Copyright Office, I could see that as more realistic. However, here, all we're talking about... And within two weeks, they issued the copyright registration. They got it, and he submitted it on July 4, 1994, and I think sent it in the mail. So in less than or equal to two weeks, they granted the registration. Why would it disappear at that point in time in the Library of Congress? So that situation is much different than... But documents do disappear. You have to admit that documents do disappear in some government agencies, and they can't be found. It's not a standard operating procedure, but it does happen. It can happen, Your Honor, yes, and we would submit that if there was any sense of that as a possibility in this case, then when Mr. Lister was doing his due diligence to get all the material information to submit his full disclosure, that would have come up. It did not. Or he could have checked afterwards, after the examiner made his prima facie case and was supported by substantial evidence, as Ingrate Hall and Nature's Remedies say. The applicant can submit countering evidence, and sometimes it works. Mr. Piccolo, I have two questions. Number one, is the filing of an IDS an admission of prior art? It's an admission of art. I'd like to say it this way, Your Honor. It is information that is either material to patentability or close to material to patentability, and the PTO, if I'm understanding correctly, did not, as Mr. Lister asserts, negate his patent application based on the mere submission of the IDS. So, no, it's not a draconian measure used by PTO. So the answer to my question is it is or is not an admission. Is the filing of a document in an IDS an admission that that document is prior art, qualified prior art under applicable statutes? Not necessarily. Clearly, an applicant does that in satisfaction of the duty to disclose. So my question is, is that an admission that it is prior art? Usually, yes. In this case, the applicant went in. It is? As a matter of law. Okay, which is a different situation than here. Let me help you with this. Let me give you a hypothetical. Let's suppose an applicant finds a document that is a disclosure of the exact invention, no date on the document. It has all the appearances of some document that might have been printed and published and distributed, maybe an advance notice or who knows. And there's no question that it's the exact same thing that is being claimed. And the applicant says, well, I don't know what this is. There's no date on it. I have no idea whether this is or is not prior art, but I don't want to get zinged later on with an argument that I'm acting with inequitable conduct, so I'm going to submit it. Can the patent office say, wow, this is great. You submitted this document. It shows exactly what you're claiming. I'm going to reject all your claims. There's no date on it, but that's okay. That's a prima facie case. You can always come back and say, no, that's not a good date. Is that enough? No, Your Honor. I don't think the examiner... Here we have a date. In that situation... Well, wait a second. We don't necessarily have a date here. We have a date that at least as of, what, April 1, 1998, when the IDS was submitted, that Westlaw has some capability. We don't necessarily have a date before that, do we? Yes, Your Honor. We have the copyright registration date of, and this is on page 127 of the record at the top, next to the register. No, but the date is when was this available on Westlaw? So if I'm understanding, we have the printed publication around this date of registration of the Copyright Office, and then when it's publicly accessible, as the examiner found, Mr. Lister said to the PTO in his IDS, that Westlaw piggybacks on copyright registration information, does so directly, and you wouldn't find it by keyword searching. That was his argument. But it doesn't say when. I agree, Your Honor, that it just paints the picture that it's around the time that the document was housed in the Library of Congress, because when he was submitting this information, if there was any doubt or any gap as to this document at the library, and it was just granted a copyright, and Westlaw piggybacks on the Copyright Office information directly and uses keywords, that is enough to connect the dots. The question here is really whether the Patent Office is entitled to simply rely on this, make these sort of assumptions, and use that as the basis for its prima facie case, or whether the Patent Office has an obligation to at least reach out and make an effort to find out, and there is the process that's available, to reach out to, in this case, the Copyright Office or Westlaw and find out when this was available, and clearly that would have been a prima facie case, but that wasn't done, so the question is whether the Patent Office is entitled, without taking those steps, simply to rely on some supposition, reasonable as it may be, to make out a prima facie case. And the examiner did reasonably use this information in a fair way to put the applicant on notice, and it's very interesting that the applicant did not say no prima facie case was made because of a gap in time or the date evidence, especially when preserving arguments to the Board, and this Court's case law is very clear that you have to argue specifically to preserve it, and we would submit that that would be a very specific type of argument to raise to the Board if you thought the examiner erred in that respect. Mr. Lister didn't think the examiner erred in that respect at the time of arguing to the Board. His brief is very clear on that. His request for reconsideration is very clear on that. He submitted new evidence about that it wasn't access, which Klopfenstein also takes care of in his request for reconsideration, so he not only didn't argue... Well, if, however, Your Honor, the proper time to address that would be during prosecution, at least to the Board, not wait to this Court and say with this new theory, well, there was a gap in time and the examiner did not get 100% of the information and essentially lie in wait until there's an appellate process about, oh, is there this missing information? That's what we argued in our red brief. And he did not request the Board to reconsider based on that theory as well. So it's really strange. Thank you, Mr. Bickle. I think we're beginning to repeat ourselves. Thank you, Your Honor. Mr. Misery, three minutes. A couple of points. First, I want to clarify the nature of the documents on deposit with the Copyright Office. I think there may be some confusion on this. The Copyright Office does not, I actually took the opportunity since I was in town to send a colleague yesterday to the Copyright Office. These documents are housed in a warehouse, not on site. It's not like you can walk up and down and grab documents off the shelves or ask a librarian to go back and get one for you. Yeah, but we don't, I mean, the problem with that kind of thing is we don't know what was going on in 1995. That ought to be your position. Well, I agree, but I just want to clarify that the notion that this is a library where you can just walk in and ask for a document is incorrect. It's established in the record. This is an unpublished manuscript, which means that you can't get a copy of it from the Copyright Office unless, of course, there's a court order or you get permission from the author. None of those situations are present here. But you can go and observe it. You can go and observe it among however many other references you might have found with your keyword search. You have to know that it's there. But there's no debate. You can't observe it. You can't observe it. You could observe it in 1994 after it was registered. You could observe it in 1994 among however many other documents were there. This is very different than I would submit the Klopfenstein situation where you have poster boards that are up. They're meant for public observation at the conference of the people who are interested in that particular industry. It's a very different kind of a situation. Second, I would like to respond... answer to the question that the Patent Office raised in its rejection. Come back to Dr. Lister and he would say, well, it was not available publicly until the year 2000. It would not be available. Why would that be his burden to carry at that point in time? I'd like to direct your attention, if I may, to page 11 of our reply brief where we outline in great detail exactly the exchange with the examiner because there's this notion that we have somehow waited until now to spring this argument for the very first time and that's just not correct. In fact, the record shows, I want to quote directly from the response we made to the examiner during prosecution. To be clear, applicant does not agree with the examiner's assertion that a Westlaw database or any other such searchable database was available to assist interested persons searching for the unpublished manuscript at a time prior to the critical date nor the assertion that any such database, if available, contained a searchable record of the registration. Now, instead of responding to that argument, the examiner says it's unfathomable how the applicant can state that he disagrees when he himself provided the statement. He's trying to read an admission into our IDS that isn't there. Again, to the bore, we came back. It's on page 12. The applicant has not admitted that such keyword searching was possible prior to the critical date. This is not an issue that we've lied in wait to present for the first time to this. It was made before the examiner. He had every opportunity to correct the problem. For whatever reason, chose not to do so. We presented it to the board. And again, they made no finding as to when this particular document did become accessible. Thank you, Mr. Mitchley. The case is submitted. All rise.